# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 11, 2017       Decided October 17, 2017

No. 16-1222

MULTICULTURAL MEDIA, TELECOM AND INTERNET COUNCIL
AND THE LEAGUE OF UNITED LATIN AMERICAN CITIZENS,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

On Petition for Review of an Order of
the Federal Communications Commission

*Caroline S. Van Zile* argued the cause for petitioners. With her on the briefs was *Clifford M. Sloan*.

*Michael J. Gottlieb* and *Gregory J. Dubinsky* were on the brief for *amici curiae* Asian Americans Advancing Justice | AAJC, *et al.* in support of petitioners.

*Andrew Jay Schwartzman* was on the brief for *amici curiae* Former FCC Officials in support of petitioners.

*Thaila K. Sundaresan*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the

brief were *Robert B. Nicholson* and *Jonathan Lasken*, Attorneys, U.S. Department of Justice, *Howard J. Symons*, General Counsel at the time the brief was filed, Federal Communications Commission, *David M. Gossett*, Deputy General Counsel, and *Jacob M. Lewis*, Associate General Counsel. *Richard K. Welch*, Deputy Associate General Counsel, entered an appearance.

*Jerianne Timmerman* was on the brief for *amicus curiae* The National Association of Broadcasters in support of respondents.

Before HENDERSON, KAVANAUGH, and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Circuit Judge* HENDERSON joins and with whom *Circuit Judge* MILLETT joins as to Part II.A.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* MILLETT.

KAVANAUGH, *Circuit Judge*: In some Administrative Procedure Act cases, an agency is alleged to have acted contrary to a statutory command or prohibition, or to have exceeded the scope of statutory authority granted to the agency by Congress. *See, e.g.*, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). In other APA cases, by contrast, the agency is acknowledged to have discretion under the relevant statute, but is alleged to have exercised that discretion in an arbitrary and capricious (that is, unreasonable) manner. *See, e.g.*, *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983).

In this case, petitioners raise both kinds of challenges – a statutory argument and, in the alternative, an arbitrary and capricious argument – to an FCC decision regarding the nationwide emergency alert system. Under the FCC's decision, when broadcasters receive emergency alerts from government entities, the broadcasters may, if they choose, broadcast the alerts only in English. The broadcasters are not required to translate emergency alerts and broadcast the alerts in languages in addition to English. The FCC decided that it needed to gather more information before it could conceivably impose multi-lingual requirements of that kind on broadcasters. We conclude that the FCC's decision was consistent with the relevant statute and was reasonable and reasonably explained. We therefore deny the petition for review.

I

The emergency alert system is a complicated endeavor. The system involves the federal government, state governments, and local governments. It also involves hundreds of television stations, cable systems, and radio stations, whom we will refer to collectively as "broadcasters."

For purposes of this case, two groups are especially relevant.

First are the alert originators who compose the emergency alerts and transmit them to broadcasters. The alert originators are ordinarily government entities – usually the National Weather Service or state or local governments.

Second are the private broadcasters who act as passive conduits for the emergency alerts. Broadcasters receive the alerts from the alert originators and then broadcast those alerts

to the public.  Importantly, the process by which broadcasters receive and broadcast emergency alerts is automated and automatic.

Alert originators can (and sometimes do) compose and transmit alerts in languages in addition to English.  And broadcasters in those circumstances then automatically broadcast the alerts in those other languages as well.  But as petitioners concede, the FCC lacks authority over alert originators and therefore cannot compel alert originators to transmit alerts in languages in addition to English.  *See* Tr. of Oral Arg. at 33-34.

By contrast, the FCC does have authority over broadcasters who participate in the emergency alert system.  But as of now, the FCC does not require broadcasters to translate emergency alerts into other languages and then broadcast the alerts in those other languages as well as in English.  The FCC is studying (admittedly on what one might call "bureaucracy standard time") whether to require broadcasters to do so.  But before deciding that question, the FCC for now has sought more comprehensive information on whether and how broadcasters can translate emergency alerts and broadcast them in languages in addition to English.

II

Several public interest organizations have challenged the FCC's decision to gather more information rather than to *now* require broadcasters to translate alerts and broadcast the alerts in multiple languages.  Petitioners advance substantial policy arguments.  But the issue before us is one of law, not policy.  And under the law, the FCC's approach passes muster.

5

A

First, petitioners raise a statutory argument. They contend that the FCC's decision violates Section 1 of the Communications Act. Section 1 is the Act's statement of purpose. As amended in 1996, Section 1 provides that the FCC operates "so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service." 47 U.S.C. § 151.

The problem for petitioners is that this general policy provision does not require the FCC to compel broadcasters to broadcast emergency alerts in any language other than English. To begin with, policy statements, "by themselves, do not create statutorily mandated responsibilities." *Comcast Corp. v. FCC*, 600 F.3d 642, 644 (D.C. Cir. 2010) (internal quotations omitted). In addition, Section 1 by its terms does not impose an affirmative obligation on the FCC to take any particular action. Unlike other statutes, moreover, Section 1 says nothing about English language abilities. *Cf.* Voting Rights Act § 2, 52 U.S.C. § 10303(f)(2) ("No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.").

If Congress intended to require multi-lingual communications in general, and multi-lingual emergency alerts in particular, we would expect Congress to have spoken far more clearly than it has done in this general statement of policy. *See generally FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). In short, Section 1 does not obligate the FCC to require broadcasters to translate

emergency alerts and broadcast them in languages in addition to English.

## B

All of that said, Congress has not expressly *prohibited* the FCC from requiring broadcasters in the emergency alert system to translate emergency alerts and broadcast them in languages in addition to English. Congress appears to have granted the FCC the authority to decide that question. In other words, under Congress's various broadly worded grants of authority to the FCC, the FCC apparently has discretion to require participating broadcasters to translate emergency alerts and broadcast them in languages in addition to English.[1]

Based on that premise, petitioners argue that the FCC has exercised its discretion in an arbitrary and capricious (that is, unreasonable) manner by seeking more information from broadcasters rather than using its authority to mandate multi-lingual alerts now.

In arbitrary and capricious cases, we distinguish substantive unreasonableness claims from lack-of-reasoned-explanation claims. A substantive unreasonableness claim ordinarily is an argument that, given the facts, the agency exercised its discretion unreasonably. A decision that the agency's action was substantively unreasonable generally means that, on remand, the agency must exercise its discretion differently and reach a different bottom-line decision. By contrast, a lack-of-reasoned-explanation claim in this context

---

[1] To be precise, no one in this case disputes that the FCC has statutory authority to require participating broadcasters to broadcast alerts in other languages. For purposes of this case, we will therefore assume without deciding that the FCC possesses such authority.

ordinarily consists of a more modest claim that the agency has failed to adequately address all of the relevant factors or to adequately explain its exercise of discretion in light of the information before it.[2]

In short, an agency's exercise of discretion must be both reasonable and reasonably explained. *See Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 926 (D.C. Cir. 2013); *National Telephone Cooperative Association v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). That "reasonable and reasonably explained" standard is deferential: The court does not substitute its own policy judgment for that of the agency. According to the Supreme Court, moreover, an agency's refusal to promulgate a new rule is subject to even more deferential review: Review in such cases is "extremely limited and highly deferential." *Massachusetts v. EPA*, 549 U.S. 497, 527-28 (2007) (internal quotations omitted). At the same time, the standard of review is not toothless: The court must ensure that the agency's action – and the agency's explanation for that action – falls within a zone of reasonableness. *See State Farm*, 463 U.S. at 43.

The precise legal question here, therefore, is whether the FCC has exercised its discretion in a manner that was reasonable and reasonably explained.

On this record, it was not unreasonable for the FCC to gather more information from relevant parties before deciding

---

[2] As those familiar with administrative law understand, however, a court sometimes issues a decision on lack-of-reasoned-explanation grounds that, in reality, leaves the agency little to no choice but to reach a different substantive result on remand. In those circumstances, the court's conclusion that the agency failed to adequately explain its exercise of discretion can be equivalent (in its effects) to a substantive unreasonableness decision.

whether to compel broadcasters to translate emergency alerts and broadcast them in languages in addition to English.

To begin with, the National Association of Broadcasters has noted in its amicus brief that affected individuals who do not understand English often rely on sources other than the traditional emergency alert system for information about future and existing emergencies. For example, a separate wireless emergency alert system now applies to wireless devices. Individuals who select Spanish as their preferred language on their mobile devices will receive emergency text alerts in Spanish. Moreover, individuals who do not understand English sometimes may rely on the same Internet, television, and radio news sources that they ordinarily rely on to obtain information in the languages that they understand. But those alternative sources, while undoubtedly helpful, do not fully resolve petitioners' concerns because those sources, at least at this time, are not always adequate substitutes in certain kinds of emergencies.

As the FCC explained, the best way to ensure multi-lingual emergency alerts through the traditional emergency alert system would be for the *alert originators* – who themselves are ordinarily federal, state, or local government entities – to transmit emergency alerts to broadcasters in multiple languages. *See* Final Order ¶ 20, J.A. 12.[3] That is because the emergency alert system is automated and automatic. Broadcasters operate as passive conduits between the alert originators and the general public. The problem for petitioners, as they concede, is that the FCC lacks authority to require *alert*

---

[3] In certain States such as Florida, some alert originators do transmit emergency alerts in Spanish. Tr. of Oral Arg. at 18. So too in Puerto Rico, alert originators transmit alerts in Spanish. *Id.*

*originators* to offer the alerts in languages in addition to English. *See* Tr. of Oral Arg. at 33-34.

To be sure, the FCC does regulate *broadcasters*. But to reiterate, even though the FCC has authority over broadcasters, broadcasters traditionally have been mere passive conduits for emergency alerts. In other words, broadcasters traditionally have not created or altered the content of emergency alerts transmitted to them by the alert originators.

As the FCC has pointed out, moreover, there are real practical and technological concerns about forcing broadcasters into a new role in the emergency alert system.

The emergency alert system is largely automated. Many broadcasters lack the personnel to translate and then broadcast in other languages the emergency messages that they receive from alert originators. In some circumstances, there may be no personnel in the station at the time of an emergency alert. In other circumstances, the broadcasters may have personnel present in the station, but those personnel may lack the language skills to make a translation into other languages.

In addition, broadcasters face stringent time constraints. In emergencies such as tornadoes or floods or terrorist attacks, every second can matter. By regulation, broadcasters must broadcast state and local emergency alerts within 15 minutes of receipt. *See* 47 C.F.R. § 11.51(n). They must broadcast Presidential emergency messages immediately. In addition, the alert messages themselves typically must be no more than two minutes. *See* 47 C.F.R. § 11.33(a)(9). Therefore, broadcasters would have to translate an alert, squeeze both the original and translated messages into two minutes (at most), and broadcast both messages within 15 minutes of receipt of the alert. Because broadcasters would not have much time

during emergencies to accomplish all of that, they would presumably need to have personnel available at all times who could translate emergency alerts into multiple languages. Broadcasters are not currently equipped to meet such a requirement.

On top of that, petitioners' approach would change an automated system into a system with a substantial possibility of human error in translation (as well as potential after-the-fact liability against broadcasters for erroneous translations). The current automated and automatic system – with the onus on alert originators to provide multi-lingual alerts when they see fit to do so – does not carry that same risk of inaccuracies.

In considering this question, moreover, it bears mention that petitioners do not want alerts just in English and Spanish. They want alerts in whatever languages might be commonly spoken in particular local communities, such as (to name just a few) Portuguese, Chinese, Vietnamese, Japanese, or Arabic. Given the variety of languages in addition to English that are spoken throughout the United States, that would be a difficult, complicated, and costly task for many broadcasters.

In contending that the FCC has acted unreasonably here, petitioners point to the FCC's recent action requiring that emergency alerts be made visually available to individuals with hearing disabilities. Petitioners contend that this example shows that the FCC could do something similar for people who do not understand English. Congress mandated the visual emergency alerts for persons with hearing disabilities. *See* Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260, 124 Stat. 2751. Congress has not issued a similar mandate for multi-lingual alerts. In any event, petitioners' point fails because the needs of individuals with hearing disabilities can be met with a visual

crawl – no translation is necessary. By contrast, mandating that broadcasters translate the content of alert messages into other languages would require, among other things, that broadcasters hire personnel who would be available at all times and could translate alerts into other languages.

In arguing for multi-lingual alerts, petitioners advanced a variety of specific proposals to the FCC. But the FCC concluded that none of the proposals fully resolved the various practical problems with requiring broadcasters to translate alerts and broadcast them in languages in addition to English. The vast majority of commenters opposed petitioners' specific proposals. The FCC concluded that "implementing" petitioners' specific proposals, "even in modified form, would be difficult if not impossible to do within the existing EAS architecture." Final Order ¶ 2, J.A. 2.

Given all of the legal and factual circumstances surrounding this issue at the present time, it likely would be reasonable for the FCC to flatly say that the alert originators (the federal, state, and local government entities) are the parties responsible for deciding whether and when to issue emergency alerts in languages in addition to English, and to leave the issue with those government entities. In the words of the National Association of Broadcasters in its amicus curiae brief, it may be that the "only reasonable way to implement multilingual EAS alerting is a top-down approach, with emergency managers determining whether and how to issue non-English EAS alerts, and broadcasters automatically passing on such alerts." Brief for National Association of Broadcasters as Amici Curiae Supporting Respondents, at 18. After all, alert originators are not subject to the same practical and technological constraints as the broadcasters. For example, for an alert originator to transmit an alert in another language, it would take only one translator rather than the hundreds or

thousands of translators for all of the broadcasters in the relevant areas.

In any event, it is surely reasonable (even if frustrating to petitioners) for the FCC to move cautiously and gather more comprehensive information before deciding whether to force private broadcasters to play a major new role in the emergency alert system.

What about the separate question of whether the FCC reasonably explained its decision here? The FCC's explanation was not lengthy. But "*State Farm* does not require a word count; a short explanation can be a reasoned explanation." *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 248 (D.C. Cir. 2008) (Kavanaugh, J., concurring in part and dissenting in part). Here, the FCC reasonably explained that shifting some of the responsibility for message content from alert originators to broadcasters by requiring broadcasters to translate and re-broadcast emergency alerts in other languages would generate practical problems and could undermine the workability of the emergency alert system at this time. Ultimately, the FCC stated: "We agree with the majority of commenters that alert originators are best positioned to effect multilingual alerting." Final Order ¶ 20, J.A. 12. For that reason, the FCC said that it would seek more comprehensive information before deciding whether to transform the role of broadcasters in the emergency alert system. The FCC's explanation falls comfortably within the zone of reasonableness for purposes of our deferential arbitrary and capricious review under the Administrative Procedure Act.

\* \* \*

Petitioners understandably want emergency alerts to be provided in languages in addition to English. As the FCC

noted, the easiest solution to petitioners' concern would be for *alert originators* – the federal, state, and local government entities – to transmit emergency alerts in languages in addition to English in appropriate circumstances. But the FCC lacks authority to compel such action by alert originators, as petitioners concede. In the meantime, the FCC has chosen to gather more information before deciding whether to implement a second-best option of requiring *broadcasters* to translate emergency alerts and broadcast them in multiple languages.

Petitioners want the Judiciary to force broadcasters to play a major new role in the emergency alert system even though Congress and the FCC have not yet required broadcasters to do so. But the Judiciary does not make those kinds of policy choices in our system of separation of powers. Under the law and facts of this case, our judicial role is limited to assessing whether the FCC's decision was consistent with the relevant statute and was reasonable and reasonably explained. We conclude that the FCC cleared those bars. The FCC's decision to gather more information was consistent with the relevant statute and was reasonable and reasonably explained. To be sure, the FCC should move expeditiously in finally deciding whether to impose a multi-lingual requirement on broadcasters, or instead to leave the issue with alert originators and others. At some point, the FCC must fish or cut bait on this question.

We deny the petition.

*So ordered*.

MILLETT, *Circuit Judge*, concurring in part, and dissenting in part:

The federal Emergency Alert System provides immediate life-saving information to the public when emergencies like hurricanes, earthquakes, tornadoes, or terrorist attacks occur. Since its inception, however, the Emergency Alert System has only required that those life-or-death messages be broadcast in English. In 2005, Hurricane Katrina laid bare the tragic consequences of that gap when peoples' lives were lost because they could not understand the warnings. The Federal Communications Commission, which regulates emergency broadcasters, has repeatedly emphasized the urgency of bridging that critical communications divide. After spending a full decade studying the problem and potential solutions, the Commission's long-awaited answer to this crisis was to stall: To simply ask for the *third* time a question for which it already knew it would get no satisfactory response.

That is unreasonable. If the Commission needs new information, it should ask for *new* information. If it believes it should regulate, it should say so. If the Commission believes it is not the right agency to address the problem, it should say that and put the ball in what it thinks is the right court. At a minimum, the Commission was obligated to explain why it rejected the multiple solutions reasonably proposed to and previously recognized by it. The problem of ensuring effective communication to the public during crises is too grave to be ensnared in seemingly interminable bureaucratic limbo. Accordingly, while I join the court's holding in Section II.A that the Commission has not violated the anti-discrimination provision of the Federal Communications Act, 47 U.S.C. § 151, I dissent from the holding that the Commission's regulatory foot-dragging is not arbitrary and capricious. I do so for four central reasons.

*First*, at bottom, the majority opinion holds that it is reasonable for the Commission to again solicit information from States about voluntary efforts that they have undertaken regarding the transmission of multilingual alerts. *Final Order*, 31 FCC Rcd. 2414, 2415 ¶ 1 (2016). Ordinarily no one would begrudge an agency's effort to compile relevant information about a complicated problem. The problem here is that the Commission (i) had already requested that same information twice within the last ten years, including as recently as two years before the Final Order, and (ii) had specifically found the results of those requests unilluminating. *See Record Refresh Order*, 29 FCC Rcd. 2682, 2689 (2014); *Second Report*, 22 FCC Rcd. 13,275, 13,307 ¶ 72 (2007).

In choosing to repeat an inquiry that has twice been asked and answered, the Commission identified no reason to believe that round three of reporting would reveal new ways to address the multilingual problem. After all, the lack of helpful feedback in those earlier reports was not due to any apparent flaw in the nature of the earlier requests. It was because the overwhelming number of States and localities simply have not been taking voluntary measures to address the need for multilingual alerts. Underscoring the emptiness of its measure, the Commission candidly acknowledged in the Final Order that the required reports are virtually certain to show what they had already shown in 2007 and in 2014: The "vast majority" of participants are doing nothing with respect to multilingual alerts. *Final Order*, 31 FCC Rcd. at 2427 ¶ 25. The Commission, in other words, knew it was fishing in a dry river bed.

The closest the Commission comes to even hoping that the information might have some future utility is its anemic statement that the information "*may* provide insight into structural impediments that *might* be ameliorated by future

Commission or federal action[,] *if appropriate*." *Final Order*, 31 FCC Rcd. at 2426 ¶ 23 (emphases added). But of course the earlier studies had already trod that same ground. When confronted with an issue of admitted urgency and public safety, "[d]oing the same thing over and over again and expecting different results" would seem to be strong evidence of arbitrary and capricious agency action.[1]

*Second*, the Final Order's exclusive focus on voluntary efforts needs to be explained given that the Commission's prior attempts at using voluntary measures to ameliorate the multilingual-access problem had failed miserably. In 2008, the Commission tried what was called the "designated-hitter test," in which a specific station was chosen in advance to provide emergency alerts in a second language if there were no other stations broadcasting in that language during the emergency. That approach floundered because no one was willing to volunteer to serve as a designated hitter or a Local Primary Spanish or Multilingual station. On top of that, "virtually no parties" responded to the Commission's past requests for information about any voluntarily adopted "multilingual [Emergency Alert System] activities currently in progress[.]" *Final Order*, 31 FCC Rcd. at 2427 ¶ 25. The Final Order provides no reasoned basis for thinking that anything has changed. To the contrary, the Commission candidly expects nothing different. *See Final Order*, 31 FCC Rcd. at 2425 ¶ 21 ("This requirement may be fulfilled by indicating that no steps have been taken."); *id.* at 2427 ¶ 26.

*Third*, the majority opinion says next to nothing about the Commission's unexplained blanket rejection of all of the solutions proposed by petitioner Multicultural Media and others. Majority Op. 11.

---

[1] Quotation attributed to Albert Einstein.

Twelve years ago, six specific approaches to facilitating the multilingual dissemination of emergency information were presented to the Commission:

- Require all National Primary stations to air all presidential messages in both English and Spanish, and for all other stations to retransmit such messages in both languages.

- Mandate that state and local Emergency Alert System plans include a station designated as a "Local Primary Spanish" station in any community with a Latino population of either 50,000 or 5% of the total market population, which would be responsible for distributing local emergency alerts, such as those from the National Weather Service, in Spanish.

- Direct state and local plans to include a "Local Primary Multilingual" station in any community with a language minority population (such as Vietnamese) of either 50,000 or 5% of the total market population, which would be responsible for broadcasting emergency alerts in a second language.

- Require at least one station in each market to monitor the Local Primary Spanish and Local Primary Multilingual stations and rebroadcast their emergency alerts in the second language as well as English.

- Issue a rule requiring those stations that remain on the air during an emergency to rebroadcast emergency information in the second language if

the Local Primary Spanish or Local Primary Multilingual station goes off the air.

- Encourage all broadcasters to assist a Local Primary Spanish or Local Primary Multilingual station damaged in an emergency to return to the air as soon as possible.

After ten years of soliciting general comments and additional submissions from petitioners (and others), the Commission discarded those specific proposals *en masse* in the last three paragraphs of the Order. The Commission stated without elaboration that the "[p]roposals [a]re [u]nsupported and [l]ack [s]pecificity." *Final Order*, 31 FCC Rcd. at 2429.

It is textbook administrative law that the Commission "must consider and explain its rejection of 'reasonably obvious alternatives'" to its proposed rule. *National Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (quoting *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir. 1979)). We are, moreover, "particularly reluctant to blink at an agency's ignoring ostensibly reasonable alternatives where it admits, as the Commission has here, that the choice embraced suffers from noteworthy flaws." *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987). Confronted with a matter of critical public safety, the Commission's failure to explain why it chose the path of expectedly ineffectual reporting, rather than any of the proposed alternatives, compounds the unreasonableness of its decision.

For example, the petitioners proposed that the Commission require state plans to address multilingual alerts in light of their populations' particular needs. That proposal is sufficiently tenable to warrant serious consideration. In fact,

the Commission-sponsored report following Hurricane Katrina proposed "encourag[ing] state and local government agencies * * * to take steps to make critical emergency information accessible" to non-English speaking Americans. J.A. 182. The Commission doubled down on this idea in its 2014 request to refresh the record, expressly proposing that "one potential approach" to addressing multilingual alerts is "for the Commission to require that this issue be addressed as part of state [Emergency Alert System] plans[.]" *Record Refresh Order*, 29 FCC Rcd. at 2688. The Commission explained that "incorporating this requirement into the state [Emergency Alert System] plan rules would ensure that this issue is addressed in a manner consistent with other parts of a state's overall [Emergency Alert System] planning." *Id.* In addition, allowing States to address multilingual alerts themselves would alleviate concerns about "mandat[ing] 'one size fits all' solutions," given the "variance of key factors, such as the make-up of the local population, topography, etc., that applies in each market." *Final Order*, 31 FCC Rcd. at 2425 ¶ 20.

The proof of this model's potential viability is in the pudding. As the majority opinion notes (at 8 n.3), Florida and Puerto Rico have successfully issued alerts in Spanish. In addition, according to the Commission, Minnesota issues alerts in four languages (English, Spanish, Hmong, and Somali). Oral Argument Tr. at 18.

Yet when it came to the Final Order, the Commission was inexplicably mute about this potentially workable approach. After all, if "the determinative factors in disseminating non-English [emergency] alert content are largely localized," *Final Order*, 31 FCC Rcd. at 2428 ¶ 28, mandating that local areas and States individually address the need for multilingual alerts and the best approach for providing them (*i.e.*, whether through

alert originators or broadcasters) seems at least worth considering.

Likewise, the Commission might have required the use of decoders or encoders capable of issuing multilingual alerts. The Commission has long been aware, as documented in this very administrative record, that technology could likely be developed to translate messages and alerts automatically. In its first notice of proposed rulemaking in 2004, the Commission observed that "products can be developed to convert the [emergency alert] digital signal to provide aural and visual messages in any language." *First Notice*, 19 FCC Rcd. 15,775, 15,790 ¶ 40 (2004); *see also Second Report*, 22 FCC Rcd. at 13,295 ¶ 40 (discussing possible development of technology that will enable "the simultaneous transmission of multilingual messages"). In its notice seeking to refresh the record in 2014, the Commission again sought comments on "the advancement of possible technical solutions for multilingual alerting since 2007," and the ability to use such technologies to translate alerts. *Record Refresh Order*, 29 FCC Rcd. at 2689. This approach would also alleviate the resource constraint and human error concerns raised by the majority (Op. 8–10).

Even more importantly, by the time the Commission issued its Final Order, some such technology apparently was available. As the Commission itself explained in the Final Order, there is technology capable of "generat[ing] multiple language audio translations" and of "includ[ing]" "translations of other language(s)" in text that crawls across the bottom of broadcast screens. *Final Order*, 31 FCC Rcd. at 2418 ¶ 7; *see also* Oral Argument Tr. at 26:22–25 (FCC Counsel: "[Broadcasters] can take the incoming header codes of the alert * * * and they can convert that into a basic visual crawl in Spanish or in foreign Creole or any language and that's entirely automated."); *id.* at 28:11–14 (FCC Counsel: "[S]o

[Emergency Alert System] participants can take English text and user software to convert that into a Spanish audio and so that is the technology that is available now."). Moreover, the technology is sufficiently reliable that the Commission has encouraged participants to adopt it. *See Final Order*, 31 FCC Rcd. at 2418 ¶ 7; *see also* Oral Argument Tr. at 27:6–11, 28:10–22.

Once more, the Final Order is completely silent as to why that alternative could not be tried. The Commission never explains why it cannot mandate that participants, either generally or those designated as Local Primary Spanish or Multilingual stations, investigate the use of available technology to address the need for translation. After all, the Commission already mandates that participants have equipment capable of meeting other technical requirements, such as transmitting a visual message to reach deaf individuals. *See, e.g.*, 47 C.F.R. § 11.51(h)(3).

One more illustration: The petitioners proposed that the Commission assign Local Primary Spanish or Multilingual stations the duty to translate and re-transmit any alerts. The Commission never addressed this proposal in the Final Order at all, let alone explained why it could not require States to consider this option in their state plans.

Instead of analyzing those potentially viable options—some of which the Commission itself had previously endorsed as worthy of consideration—the Commission's Final Order seemingly throws up its hands in the face of an array of rules that could make implementing new measures complicated. The Commission notes that participants must air all alerts within fifteen minutes of receipt, making it difficult to translate the original alert in time. *Final Order*, 31 FCC Rcd. at 2417–2418 ¶ 6; *see* 47 C.F.R. § 11.51(n). Participants could not get

around that problem by generating a second alert with the translated message, the Commission reasoned, because the system would reject a duplicative alert. *Final Order*, 31 FCC Rcd. at 2418 ¶ 6 n.21; *id.* *see* 2429 ¶ 33 n.86; *see* 47 C.F.R. § 11.33(a)(10). Nor could the participants simply transmit audio in both English and another language because, according to the Commission, alert messages are limited to two minutes. *Final Order*, 31 FCC Rcd. at 2418 ¶ 6; *id.* at 2429 ¶ 33 n.86; *see* 47 C.F.R. § 11.33(a)(9).

The need for multilingual alerts is no doubt a complicated problem—a point the majority opinion fairly acknowledges. That presumably is why the Commission spent a decade collecting needed information and studying options. But invoking their regulations does not substitute for reasoned decision making because those are largely barriers of the Commission's own making. It is the Commission's rules that require messages to be transmitted within fifteen minutes, that treat a translated message as a duplicate message and bar its transmission, and that require messages to be two minutes or shorter in duration. Those rules, however, are not written in stone; the Commission has considered their modification before to improve the reach of alert transmissions. *See Review of the Emergency Alert System*, Third Notice of Proposed Rulemaking, 26 FCC Rcd. 8149, 8193–8194 ¶¶ 119–121 (2011) (proposing to create a new message originator or event code for gubernatorial messages to facilitate mandatory carriage of such alerts); *id.* at 8198–8199 ¶ 134 (requesting comment on whether to expand the time frame for messages from governors or to allow participants to disable the reset function for such messages). Given the acknowledged importance of addressing the language gap in the Emergency Alert System, it was incumbent on the Commission to explain why it could not also adjust its regulations to accommodate this growing public-safety need.

*Fourth*, the majority opinion's acceptance of more agency temporizing loses sight of what is at stake here. Since 2006, the Commission has repeatedly stressed that emergency alerts are "*essential* to help save lives and protect property during times of national, state, regional, and local emergencies." *Review of the Emergency Alert System*, Sixth Report and Order, 30 FCC Rcd. 6520, 6545 ¶ 53 (2015) (emphasis added). Such alerts "must be accessible if the [System] is to fulfill its purpose of informing all Americans * * * of imminent dangers to life and property." *Id.* at 6538 ¶ 37. That is why the Commission has emphasized time and again "the need for *all* Americans— including those whose primary language is not English—to be alerted in the event of an emergency." *Second Report*, 22 FCC Rcd. at 13,306 ¶ 72; *see also id.* at 13,295 ¶ 40 ("We also affirm our commitment that non-English speakers should have access to EAS alerts[.]"); *First Notice*, 19 FCC Rcd. at 15,790 ¶ 40 ("We should also consider the needs of people with primary languages other than English when considering the best method of contacting the public during an emergency.").

In addition, a report ordered by the Commission after Hurricane Katrina expressly recommended that the Commission "commence efforts to ensure that * * * non-English speaking Americans receive meaningful alerts[.]" J.A. 141; *see also* J.A. 170–171 (discussing the failure to get meaningful emergency alerts and information to non-English speakers during the hurricane); J.A. 182 (listing steps the Commission should take to "ensure that all Americans, including those * * * who do not speak English, can receive emergency communications").

The Commission has inexplicably failed to match its actions to its words. Unquestionably, the lives of non-English speakers are just as much in need of saving as those of English speakers. And the Commission forthrightly acknowledges that

effective communications through the Emergency Alert System are just as vital for non-English speakers to receive as they are for English speakers.

Even worse, the Commission knows that agency inaction comes at a terrible price. When Hurricane Katrina and its flooding hit, KGLA(AM)—the sole Spanish language station in the New Orleans area—went off the air, leaving the city's tens of thousands of primarily Spanish-speaking residents without ready access to vital information on the hurricane and its aftermath, or to official guidance concerning safety measures and places to get help. The consequences of that communications shortfall proved deadly. For example, KGLA reported that an entire Latino family, unaware of gas leaks in the area, was killed after lighting a match in their home. In addition, the National Council of La Raza reported that, when the storm destroyed an apartment building in Gulfport, Mississippi, 70 to 80 Jamaican, Peruvian, and Brazilian residents went missing and were presumed dead because they had not received the evacuation warnings in Spanish or Portuguese.[2]

Recent events underscore the singular importance of the Emergency Alert System's broadcast channels. When Hurricane Maria hit Puerto Rico, 95% of the island's wireless cell sites went out of service, preventing residents from accessing information on their mobile devices, cell phones, and computers. At one point, a single radio station was the sole source of emergency information for the entire island.[3]

---

[2] The report also recounted the story of a woman in New Orleans who did not receive reports of flooding in her community and barely managed to escape the rising waters with her two-year-old son.

[3] *See* Luis Ferré-Sadurní, Hurricane Maria Updates: In Puerto Rico, the Storm 'Destroyed Us', N.Y. TIMES, Sep. 22, 2017,

With lives on the line, a decade of study would seem to have been ample time to decide *something*. Or at the very least to provide *some explanation* as to why potentially viable options before it were cast aside, while the Commission chose to spin its wheels.

* * * * *

To sum up, the problem with the Commission's decision is not that it had to regulate or had to choose a specific solution. The majority opinion is correct that the Commission may exercise reasonable judgment in this area. The problem is that, when facing a life-endangering problem that the Commission admits is *imperative* to address, the Commission chose to just do again what had not worked before, without giving any reasoned explanation for its knowingly ineffectual action. And handwringing over challenges created by the Commission's own regulations is a self-constructed barrier, not a reasoned response. If the Commission's decade of serious study revealed that this is a problem for alert originators to address, it should say so, and pass responsibility to whoever the Commission concludes can save lives. What is unreasonable is retaining ownership of the problem for decades while, in reality, just continuing to tread water. This is not an agency acting on "bureaucracy standard time" (Op. 4). This is the regulatory equivalent of fiddling while Rome burns.

I respectfully dissent.

---

*available at https://www.nytimes.com/2017/09/21/us/hurricane-maria-puerto-rico.html.*