Opinion for the Court filed by Circuit Judge Kavanaugh, with whom Circuit Judge Henderson joins and with whom Circuit Judge Millett joins as to- Part II.A. Opinion concurring in part and dissenting in part filed by Circuit Judge Millett. KAVANAUGH, Circuit Judge: In some Administrative Procedure Act cases, an agency is alleged to have acted contrary to a statutory command or prohibition, or to have exceeded the scope of statutory authority granted to the agency by Congress. See, e.g., Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), In other APA cases, by contrast, the agency is acknowledged to have discretion under the relevant statute, but is alleged to have exercised that discretion in an arbitrary and capricious (that is, unreasonable) manner. See, e.g., Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2866, 77 L.Ed.2d 443 (1983). In this case, petitioners raise both kinds of challenges—a , statutory argument and, in.the alternative, an arbitrary and capricious argument—to an FCC decision regarding the nationwide emergency alert system. Under the FCC’s decision, when broadcasters receive emergency alerts from government entities, the broadcasters may, if they choose, broadcast the alerts only in English. The broadcasters are not required to translate emergency alerts and broadcast the alerts in languages in addition to English. The FCC decided that it needed to gather more information before it could conceivably impose multi-lingual requirements of that kind on broadcasters. We conclude that the FCC’s decision was consistent with the relevant statute and was reasonable and reasonably explained. We therefore deny the petition for review. I The emergency alert system is a complicated endeavor. The system involves the federal government, state governments, and local governments. It also involves hundreds of television stations, cable systems, and radio stations, whom we will refer to collectively as “broadcasters.” For purposes of this case, two groups are especially relevant. First are the alert originators who compose the emergency alerts and transmit them to broadcasters. The alert originators are ordinarily government entities—usually the National Weather Service or state or local governments. Second are the private broadcasters who act as passive conduits for the emergency alerts. Broadcasters receive the alerts from the alert originators and then broadcast those alerts to the public. Importantly, the process by which broadcasters receive and broadcast emergency alerts is automated and automatic. Alert originators can (and sometimes do) compose and transmit alerts in languages in addition to English. And broadcasters in those circumstances then automatically broadcast the alerts in those other languages as well. But as petitioners concede, the FCC lacks authority over alert originators and therefore cannot compel alert originators to transmit alerts in languages in addition to English. See Tr. of Oral Arg. at 33-34. By contrast, the FCC does have authority over broadcasters who participate in the emergency alert system. But as of now, the FCC does not require broadcasters to translate emergency alerts into other languages .and then broadcast the .alerts..in those other languages as well as in English. The FCC is studying (admittedly on what one might call “bureaucracy standard time”) whether to require broadcasters to do so. But before deciding that question, the FCC for now has sought more comprehensive information on whether and how broadcasters can translate emergency alerts and broadcast them in languages in addition to English. II Several public interest organizations have challenged the FCC’s decision to gather more information’ rather -than to now require broadcasters to translate alerts and broadcast the alerts in multiple languages. Petitioners advance substantial policy arguments. But the issue before us is' one of law, not policy. And under .the law, the FCC’s approach passes muster. A First, petitioners raise a statutory argument. They contend that the FCC’s decision violates Section 1 of the Communications Act. Section 1 is the Act’s statement of purpose. As amended in 1996, Section 1 provides that the'FCC operates “so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient,. Nation-wide, and worldwide wire and radio communication service.” 47 U.S.C. § 151. The problem for petitioners is that this general policy provision does not require the FCC to compel broadcasters to broadcast emergency alerts in any language other than English. To begin with, policy statements, “by themselves, do not create statutorily mandated responsibilities.” Comcast Corp. v. FCC, 600 F.3d 642, 644 (D.C. Cir. 2010) (internal quotations omitted). In addition, Section 1 by its terms does not impose an affirmative obligation on the FCC to take any particular action. Unlike other statutes, moreover, Section 1 says nothing about English language abilities. Cf. Voting Rights Act § 2, 52 U.S.C. § 10303(f)(2) (“No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed, or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group”). If Congress intended to require multilingual communications in general, and multi-lingual emergency alerts in particular, we would expect Congress to have spoken far more clearly than it has done in this general statement of policy. See generally FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). In short, Section 1 does not obligate the FCC to require broadcasters to translate emergency alerts and broadcast them in languages in addition to English. B All of that said, Congress has not expressly prohibited the FCC from requiring broadcasters in the emergency alert system to translate emergency alerts and broadcast them in languages in addition to English. Congress appears to have granted the FCC the authority to decide that question. In other words, under Congress’s various broadly worded grants of authority to the FCC, the FCC apparently has discretion to require participating broadcasters to translate emergency alerts and broadcast them in languages in addition to English.[1] Based on that premise, petitioners argue that the FCC has exercised its discretion in an arbitrary and capricious (that is, unreasonable) manner by seeking more information from broadcasters rather than using its authority to mandate multilingual alerts now. In arbitrary and capricious cases, we distinguish substantive unreasonableness claims from lack-of-reasoned-explanation claims. A substantive unreasonableness claim ordinarily is an argument that, given the facts, the agency exercised its discretion unreasonably. A decision that the agency’s action was substantively unreasonable generally means that, on remand, the agency must exercise its discretion differently and reach a different bottom-line decision. By contrast, a lack-of-reasoned-explanation claim in this context ordinarily consists of a more modest claim that the agency has failed to adequately address all of the relevant factors or to adequately explain its exercise of discretion in light of the information before it.[2] In short, an agency’s exercise of discretion must be both reasonable and reasonably explained. See Cytori Therapeutics, Inc. v. FDA, 715 F.3d 922, 926 (D.C. Cir. 2013); National Telephone Co-operative Association v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009). That “reasonable and reasonably explained” standard is deferential: The court does not substitute its own policy judgment for that of the agency. According to the Supreme Court, moreover, an agency’s refusal to promulgate a new rule is subject to even more deferential review: Review in such cases is “extremely limited and highly deferential.” Massachusetts v. EPA, 549 U.S. 497, 527-28, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (internal quotations omitted). At the same time, the standard of review is not toothless: The court must ensure that the agency’s action—and the agency’s explanation for that action—falls within a zone of reasonableness. See State Farm, 463 U.S. at 43, 103 S.Ct. 2856. The precise legal question here, therefore, is whether the FCC has exercised its discretion in a manner that was reasonable and reasonably explained. On this record, it was not unreasonable for the FCC to gather more information from relevant parties before deciding whether to compel broadcasters to translate emergency alerts and broadcast them in languages in addition to English. To begin with, the National Association of Broadcasters has noted in its amicus brief that affected individuals who do not understand English often rely on sources other than the traditional emergency alert system for information about future and existing emergencies. For example, a separate wireless emergency alert system now applies to wireless devices. Individuals who select Spanish as their preferred language on their mobile devices will receive emergency text alerts in Spanish. Moreover, individuals who do not understand English sometimes may rely on the same Internet, television, and radio news sources that they ordinarily rely on to obtain information in the languages that they understand. But those alternative sources, while undoubtedly helpful, do not fully resolve petitioners’ concerns because those sources, at least at this time, are not always adequate substitutes ih certain kinds of emergencies. As the FCC explained, the best way to ensure multi-lingual emergency alerts through the traditional emergency alert system would be for the alert originators—who themselves are ordinarily federal, state, or local government entities—to transmit emergency alerts to broadcasters in’ multiple languages. See Final Order ¶ 20, J.A. 12.[3] That is because the emergency alert system is automated and automatic. Broadcasters operate as passive conduits between the alert originators and the general public. The problem for petitioners, as they concede, is that the FCC lacks authority to require alert originators to offer the alerts in languages in addition to English. See Tr. of Oral Arg. at 33-34. To. be sure, the FCC does regulate broadcasters. But to reiterate, even though the FCC has authority over broadcasters, broadcasters traditionally have been mere passive conduits for emergency alerts. In other- words, broadcasters traditionally have not created or altered the content of emergency alerts transmitted .to them by the alert originators. As the FCC has pointed out, moreover, there are real practical and technological concerns about forcing broadcasters into a new role.m the emergency,alert system. The emergency alert system is -largely automated. Many broadcasters lack the personnel to translate and then broadcast in other languages the emergency messages that they receive from alert originators. In some circumstances, there may be no personnel in the station at the time of an emergency alert. In other circumstances, the broadcasters may have personnel present in the station, but those personnel may lack the language skills to make a translation into other languages. In addition,, broadcasters face stringent time constraints. In emergencies such as tornadoes or floods or terrorist attacks, every second can matter. By regulation, broadcasters must broadcast state and local emergency alerts within 15 minutes of receipt. See 47 C.F.R. § 11.51(n). They must broadcast Presidential emergency messages immediately. In addition, the alert messages themselves typically must be no more than two minutes. See 47 C.F.R. § 11.33(a)(9). Therefore, broadcasters would have to translate an alert, squeeze both the original and translated messages into two minutes (at most), and broadcast both messages within 15 minutes of receipt of the alert. Because broadcasters would not have much time during emergencies to accomplish all of that, they would presumably need to have personnel available at all times who could translate emergency alerts into multiple languages. Broadcasters are not currently equipped to meet such, a requirement. On top of that, petitioners’ approach would change an automated system into a system with a substantial possibility of human error in translation (as well as potential after-the-fact liability against broadcasters for erroneous translations). The current automated and automatic system—with the onus on alert originators to provide multi-lingual alerts when they :see fit to do so—does not carry that- same risk of inaccuracies. In considering this question, moreover, it bears mention that petitioners do not want alerts just in English and Spanish. They want alerts in whatever languages might be commonly spoken in particular local communities, such as (to name just a few) Portuguese, Chinese, Vietnamese, Japanese, or Arabic. Given the variety of languages in addition to English that are spoken throughout the United States, that would be a difficult, complicated, and costly task for many broadcasters. ,In contending that the FCC has acted unreasonably here, petitioners point to the FCC’s recent action requiring that emergency alerts be made visually available to individuals with hearing disabilities. Petitioners contend that this example shows that the FCC could do something similar for people who do not understand English. Congress mandated the visual emergency alerts for persons with hearing disabilities. See Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260, 124 Stat. 2751. Congress has not issued a similar mandate for multi-lingual alerts. In any event, petitioners’ point fails because the needs of individuals with hearing disabilities can be met with a visual crawl—no translation is necessary. By contrast, mandating that broadcasters translate the content of alert messages into other languages would require, among other things, that broadcasters hire personnel: who would be available at all times and could translate alerts into other languages. In arguing for multi-lingual alerts, petitioners advanced a variety of specific proposals to the FCC. But the FCC concluded that none of the proposals fully resolved the various practical problems with requiring broadcasters to translate alerts and broadcast them in languages in addition to English. The vast majority of commenters opposed petitioners’ specific proposals. The FCC concluded that “implementing” petitioners’ specific proposals, “even in modified form, would be difficult if not impossible to do within the existing EAS architecture.” Final Order ¶ 2, J.A. 2. Given all of the legal and factual circumstances surrounding this issue at the present time, it likely would be reasonable for the FCC to flatly say that the alert originators (the federal, state, and local government entities) are the parties responsible for deciding whether and when to issue emergency alerts in languages in addition to English, and to leave the issue with those government entities. In the words of the National Association of Broadcasters in its amicus curiae brief, it may be that the “only reasonable way to implement multilingual EAS alerting is a top-down approach, with emergency managers determining whether and how to issue non-English EAS alerts, and broadcasters automatically passing on such alerts.” Brief for National Association of Broadcasters as Amicus Curiae Supporting Respondents, at 18. After all, alert originators are not subject to the same practical and technological constraints as the broadcasters. For example, for an alert originator to transmit an alert in another language, it would take only one translator rather than the hundreds or thousands of translators for all of the broadcasters in the relevant areas. In any event, it is surely reasonable (even if frustrating to petitioners) for the FCC to move cautiously and gather more comprehensive information before deciding whether to force private broadcasters to play a major new role in the emergency alert system. What about the separate question of whether the FCC reasonably explained its decision here? The FCC’s explanation was not lengthy. But “State Farm does not require a word count; a short explanation can be a reasoned explanation.” American Radio Relay League, Inc. v. FCC, 524 F.3d 227, 248 (D.C. Cir. 2008) (Kavanaugh, J., concurring in part and dissenting in part). Here, the FCC reasonably explained that shifting some of the responsibility for message content from alert originators to broadcasters by requiring broadcasters to- translate and rebroadcast emergency alerts in other languages would generate practical problems and could undermine the workability of the emergency alert system at this .time. Ultimately, the FCC stated: “We agree with the majority of commenters that alert originators are best positioned to effect multilingual alerting.” Final Order ¶ 20, J.A. 12. For that reason, the FCC said that it would seek more comprehensive information before deciding whether to transform the role of broadcasters in the emergency alert system. The FCC’s explanation falls comfortably within the zone of reasonableness for purposes of our deferential arbitrary and capricious review under the Administrative Procedure Act. * * * Petitioners understandably want emergency alerts to be provided in languages in addition to English. As the FCC noted, the easiest solution to petitioners’ concern would be for alert originators—the federal, state, and local government entities—to transmit emergency alerts in languages in addition to English in appropriate circumstances. But the FCC lacks authority to compel such action by alert originators, as petitioners concede. In the meantime, the FCC has chosen to gather more information before deciding whether .to implement a second-best option of requiring broadcasters to translate emergency alerts and broadcast them in multiple languages. Petitioners want the Judiciary to force broadcasters to play a major new role in the emergency alert system even though Congress and the FCC have not yet required broadcasters to do so. But the Judiciary does- not make those kinds of policy choices in our system of separation of powers. Under the law and facts of this case, our judicial role is limited to assessing whether the FCC’s decision was consistent with the relevant statute and was reasonable and reasonably explained. We conclude that the FCC cleared those bars. The FCC’s decision to gather more information was consistent with the relevant statute and was reasonable and reasonably explained. To be sure, the FCC should move expeditiously in finally deciding whether to impose a multi-lingual requirement on broadcasters, or instead to leave the issue with alert originators and others. At some point, the FCC must fish or cut bait on this question. We deny the petition. So ordered. . To be precise, no one in this case disputes that the FCC has statutory authority to require participating broadcasters to broadcast alerts in other languages. For purposes of this case, we will therefore assume without deciding that the FCC possesses such authority. . As those familiar with administrative law understand, however, a court sometimes issues a decision on lack-of-reasoned-explanation grounds that, in reality, leaves the agency little to no choice but to reach a different substantive result on remand. In those circumstances, the court's conclusion that the agency failed ,to adequately explain its exercise of discretion can be equivalent (in its effects) to a substantive unreasonableness decision. . In certain States such as Florida, some alert originators do transmit emergency alerts in Spanish. Tr, of Oral Arg. at 18. So too in Puerto Rico, alert originators transmit alerts in Spanish. Id.